**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| LEONARD WILSON JR., | ) | |
| GUN OWNERS OF AMERICA, INC., | ) | |
| GUN OWNERS FOUNDATION, and the | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil No.: _____ |
| | ) | |
| JACKSON COUNTY, MISSOURI, | ) | |
| SHERIFF DARRYL FORTE, in his Official | ) | |
| Capacity as the Sheriff of Jackson County, | ) | |
| Missouri, and MELESA JOHNSON, in her | ) | |
| Official Capacity as the Prosecutor of Jackson | ) | |
| County, Missouri, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs Leonard Wilson Jr., Gun Owners of America, Inc., Gun Owners

Foundation, and the State of Missouri, by and through undersigned counsel, and allege as follows:

## INTRODUCTION

1. This case involves a challenge to provisions of Jackson County, Missouri Ordinance No.

5865, which unlawfully and unconstitutionally restrict the Second Amendment rights of adults

under the age of 21 to keep and bear arms, by prohibiting them from acquiring and possessing

handguns and "semiautomatic assault rifles."

2. In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 33 (2022), the Supreme Court held

that the Second Amendment "guarantees … a right to 'bear' arms in public for self-defense."  And

in *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), the Court explained that this right "is

exercised individually and belongs to all Americans."  Further, the Court acknowledged that

"handguns are the most popular weapon chosen by Americans for self-defense," and that a complete ban on their possession is unconstitutional. *Id.* at 628-29.

3.    As *Bruen* explained further, the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Bruen*, 597 U.S. at 10.

4.    In the Supreme Court's most recent pronouncement on the Second Amendment, the Court reaffirmed its textual and historical approach, instructing courts to determine "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).  To that end, courts must apply "faithfully the balance struck by the founding generation...." *Id.*

5.    Separately, a law violates the Fourteenth Amendment's guarantee of due process "if its prohibitions are not clearly defined."[1]  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Due process requires "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Id.*  A law that is vague "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Id.* at 108-09; *see also Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966) (law violates "the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case").

---

[1] *See also State v. Brown*, 140 S.W.3d 51, 54 (Mo. 2004) (violation of due process if statute's "prohibitions are not clearly defined," because the statute must "give fair and adequate notice of proscribed conduct and protect against arbitrary and discriminatory enforcement").

6. If an ordinance "fails to give fair warning that certain conduct is prohibited," then it "violates the right to be free from a deprivation of liberty without due process...." *Langford v. City of St. Louis*, 3 F.4th 1054, 1059 (8th Cir. 2021).[2] Likewise, due process "requires legislatures to set reasonably clear guidelines … to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974).

7. Reinforcing these constitutional protections, the State of Missouri has recognized the need for uniformity of firearm regulation across the state, and to that end has preempted the "entire field of legislation touching in any way firearms...." Mo. Rev. Stat. § 21.750(1).

8. In blatant contravention of these principles, on July 22, 2024, the Jackson County Legislature promulgated Ordinance No. 5865,[3] now codified at Jackson County Code § 5577 (the "Ordinance"), which imposes various firearms restrictions at odds with both state law and federal constitutional guarantees.

9. Section 1 of the Ordinance prohibits anyone under 21 years of age from purchasing a handgun or handgun ammunition, and prohibits anyone from transferring those items to someone under 21 years of age. But the Ordinance does not define what types of cartridges, calibers, etc., constitute "handgun ammunition," leaving Plaintiffs to guess. Indeed, many (if not most) ammunition calibers are used in both handguns and rifles.

10. Section 3 of the Ordinance prohibits anyone from 18 to 20 years of age from possessing a "semiautomatic assault rifle" – an entirely undefined term – except under limited circumstances not applicable here.

---

[2] *See also State v. Faruqi*, 344 S.W.3d 193, 199 (Mo. 2011) (requiring that laws "give fair and adequate notice of proscribed conduct" such "that ordinary people can understand what conduct is prohibited" (quoting *Kolender v. Lawson*, 461 U.S. 352 (1983))).

[3] *See* https://tinyurl.com/5459ph55.

11. Those who violate the Ordinance "shall on conviction be subject to punishment by a fine of not more than one thousand dollars ($1000) or by imprisonment in the county jail for a term not exceeding one (1) year, or by both." Jackson County Code § 5520.[4]

12. In contrast, neither federal law nor Missouri law prohibits the conduct that Ordinance Sections 1 and 3 prohibit.

13. In other words, Jackson County officials have targeted an arbitrary subset of adults – people who can contract, marry, assume debt, and serve in the military – prohibiting them from engaging in conduct that is perfectly legal under federal and state law.

14. But Sections 1 and 3 of the Ordinance plainly violate the Second and Fourteenth Amendments, which guarantee the right of adults to purchase and possess handguns, handgun ammunition, and the sorts of commonly owned long guns that anti-gun jurisdictions have labeled "assault rifles."

15. Section 3 of the Ordinance additionally is void for vagueness, in violation of the Fourteenth Amendment's guarantee of due process, because it fails to define the arms ("assault rifles") that it purports to prohibit. Nor does the Ordinance define "handgun ammunition," making it also void for vagueness.

16. Finally, Sections 1 and 3 of the Ordinance are preempted under Missouri law, which expressly prohibits precisely this sort of local experimentation with novel firearm regulation.

17. Based on Jackson County's flagrant constitutional and statutory violations, Plaintiffs request injunctive relief, as well as declaratory and other relief, to rectify and prevent further violation of the law.

---

[4] *See* https://tinyurl.com/2fvh5csp.

## PARTIES

18. Leonard Wilson Jr. is a natural person, a citizen of the United States and of the State of Missouri, is 18 years of age, and is a resident of Miller County. Wilson is a member of Plaintiff Gun Owners of America, Inc. Wilson is a law-abiding person who is eligible to possess firearms under federal and Missouri law.

19. Wilson wishes to purchase a handgun and "handgun ammunition," which are lawful for him to possess under federal and state law. However, because Wilson is under the age of 21, he cannot purchase handguns or ammunition other than "for a shotgun or rifle," from a Federal Firearms Licensee ("FFL"). *See* 18 U.S.C. § 922(b)(1). Accordingly, the only lawful way Wilson can purchase a handgun and ammunition for that handgun is via private sale.

20. Wilson has an uncle who lives within Jackson County. Wilson often visits his uncle and stays with him and his family in Jackson County, sometimes for multiple days at a time. During his stays, Wilson and his uncle often shoot firearms together, an activity which often occurs at a nearby shooting range, also located within Jackson County.

21. Wilson's uncle has spoken with him, and is willing to sell Wilson a handgun and ammunition for that handgun in a private sale, to occur within Jackson County, consistent with federal and Missouri law. Specifically, Wilson has agreed to purchase from his uncle a Canik TP9 handgun, along with 9mm ammunition for it, for a total price of $300. However, under Jackson County's new Ordinance, Wilson is flatly prohibited from "purchas[ing] a handgun or handgun ammunition" in Jackson County, by virtue of being "under twenty-one years of age...." Jackson County Code § 5577(1). Likewise, under the Ordinance, Wilson's uncle is prohibited from selling Wilson a handgun and ammunition for that firearm. Wilson would purchase a handgun and

ammunition for that firearm in a private sale, and Wilson's uncle would sell a handgun and ammunition to Wilson, but for fear of arrest and prosecution under the challenged Ordinance.

22. Additionally, consistent with federal and Missouri law, Wilson intends to purchase a semiautomatic AR-15-style rifle within the next three months, complete with ubiquitous features such a threaded barrel, flash hider, pistol grip, adjustable stock, and the ability to accept detachable magazines. And, in the next 12-18 months, Wilson also wishes to purchase additional semiautomatic rifles with those same features, although not necessarily of the AR-15 style. Once he acquires one such rifle, Wilson wishes to transport it through Jackson County, possess it within Jackson County, and shoot it at the local Jackson County shooting range that he and his uncle frequent.

23. Although the Ordinance does not define what it means by "semiautomatic assault rifle," rifles with the above-listed features nevertheless have been given the pejorative names "assault rifle" and "assault weapon" in other jurisdictions.[5] But because the term is undefined in the Ordinance, Wilson (not to mention law enforcement) is left to guess whether his intended firearm purchase is a prohibited "assault rifle."

24. Nevertheless, the Ordinance prohibits Wilson from "possess[ing] a semiautomatic assault rifle" by virtue of being "less than twenty-one years of age...." *Id.* § 5577(3). And although the Ordinance provides limited exceptions to its prohibition on possession of "assault rifles," none applies to Wilson. Upon purchasing his AR-15-style rifle, Wilson wishes to transport it within his vehicle as he travels throughout Jackson County, possession which by definition will occur at places which are not "under the control of [Wilson's] custodial parent, other relative, or legal

---

[5] *See, e.g.*, https://tinyurl.com/ycyzb5je ("Copies or duplicates of banned assault rifles, including copies of the Colt AR-15 and the Kalishnikov [sic] AK-47, are prohibited by the Massachusetts assault weapons ban.").

guardian...." *Id.* § 5577(3)(c). Wilson likewise is not a "member of law enforcement, the armed forces of the United States, national guard, or organized reserves," *id.* § 5577(3)(d), nor would his simple possession during travel constitute "attendance at a firearms safety course" or "practice in the use of a firearm or target shooting." *Id.* §§ 5577(3)(a)-(b).

25. For example, Wilson wishes to possess his newly acquired AR-15 as he travels from his home in Miller County to his uncle's home in Jackson County, but fears arrest and prosecution should he do so. Wilson also cannot transport his newly acquired AR-15 from his uncle's home in Jackson County to their nearby shooting range. And even though the Ordinance might allow Wilson's possession at his uncle's home and at the shooting range, Wilson has no way to transport his AR-15 between the two locations, or to and from his home in Miller County.

26. Wilson would purchase and then possess such a purported "semiautomatic assault rifle" within Jackson County, consistent with federal and Missouri law, but for fear of prosecution under the challenged Ordinance. *See* Exhibit A, Declaration of Leonard Wilson Jr.

27. Plaintiff Gun Owners of America, Inc. ("GOA") is a California non-stock corporation with its principal place of business in Springfield, Virginia. GOA is organized and operated as a nonprofit membership organization that is exempt from federal income taxes under Section 501(c)(4) of the U.S. Internal Revenue Code. GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners. GOA has more than 2 million members and supporters across the country, including across Missouri and within Jackson County, Missouri. At least one of our members and supporters, Plaintiff Wilson, is over the age of 18 but under the age of 21 and wishes to acquire handguns and handgun ammunition via private sale in Jackson County, and wishes to purchase and possess "semiautomatic assault rifles" within Jackson County, but outside of the Ordinance's limited exceptions. Consequently, GOA members and supporters like

Plaintiff Wilson will be irreparably harmed by Jackson County's blatantly unlawful attempt to contravene Missouri's preemption law.  *See* Exhibit B, Declaration of Erich M. Pratt.

28. Plaintiff Gun Owners Foundation ("GOF") is a Virginia non-stock corporation with its principal place of business in Springfield, Virginia.  GOF was formed in 1983 and is organized and operated as a nonprofit legal defense and educational foundation that is exempt from federal income taxes under Section 501(c)(3) of the U.S. Internal Revenue Code.  GOF is supported by gun owners across the country, including residents of Missouri, who fund the organization's activities so that it can, *inter alia*, file litigation such as this to preserve, protect, and defend their right to keep and bear arms.  Although not a "traditional" membership organization, courts have found GOF to possess "indicia of membership" under *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977), for purposes of representing its supporters' interests in litigation.  *See, e.g.*, *Texas v. BATFE*, 737 F. Supp. 3d 426, 438 (N.D. Tex. 2024).  Some of GOF's supporters are over the age of 18 but under the age of 21 and, like Wilson, also reside within or visit Jackson County, but are restricted in acquiring and possessing arms by the Ordinance's provisions.  These GOF supporters will be irreparably harmed by Jackson County's blatantly unlawful attempt to contravene Missouri's preemption law.  *See* Exhibit B.

29. Plaintiff State of Missouri is a sovereign State of the United States of America.  Attorney General Andrew Bailey is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary."  Mo. Rev. Stat. § 27.060.

30. Defendant Jackson County, Missouri ("Jackson County") is a County in the State of Missouri established in 1826.  In 1970, Jackson County adopted a "Constitutional Home Rule

Charter" establishing the County Executive and the County Legislature.[6] Jackson County is the location where the Ordinance is being enforced and where the Jackson County Legislature enacted the Ordinance at issue. Jackson County, Missouri may be served with this Complaint at 415 E 12th Street, 2nd Floor, Kansas City, MO 64106.

31. Defendant Sheriff Darryl Forte, the Sheriff of Jackson County, is sued in his official capacity. Sheriff Forte has primary responsibility for enforcement of state and local law, including Jackson County's ordinances. *See* Mo. Rev. Stat. §§ 57.101, 57.110; *see also* Jackson County Charter art. VII.[7] Sheriff Forte, by and through the Sheriff's Department, enforces the Ordinance at issue in this Complaint. Sheriff Forte may be served with this Complaint at Jackson County Sheriff, 4001 NE Lakewood Court, Lee's Summit, MO 64064.

32. Defendant Melesa Johnson, the Prosecutor of Jackson County, is sued in her official capacity. Missouri law vests Defendant Johnson with the authority to "represent generally the county in all matters of law," including prosecutions for violations of its ordinances. Mo. Rev. Stat. § 56.070(1). Defendant Johnson, by and through the Jackson County Prosecutor's Office, enforces the Ordinance at issue in this Complaint. Defendant Johnson may be served with this Complaint at 415 E 12th Street, 11th Floor, Kansas City, MO 64106.

<u>**JURISDICTION AND VENUE**</u>

33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 1651, 2201, 2202 and 42 U.S.C. §§ 1983 and 1988.

34. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

---

[6] *See* https://tinyurl.com/3r3syx8y.
[7] *See* https://tinyurl.com/yc6z5ccf.

## STANDING

35. Defendants' imminent enforcement of the unlawful Ordinance against Plaintiffs – and indeed, Defendants' refusal to disavow enforcement of the Ordinance – will cause Plaintiffs irreparable harm.

36. A plaintiff has "standing to challenge the facial validity of a regulation notwithstanding the pre-enforcement nature of a lawsuit, where the impact of the regulation is direct and immediate and they allege an actual, well-founded fear that the law will be enforced against them." *Gray v. City of Valley Park*, 567 F.3d 976, 984 (8th Cir. 2009).

37. Moreover, "[a] plaintiff who alleges a threat of prosecution that 'is not imaginary or wholly speculative' has standing to challenge the statute." *Saint Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006) (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979)).

38. And "[i]t is well established that … a law takes effect on the date of its enactment." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991).

39. Accordingly, this case is ripe for review because the Ordinance is currently in effect in Jackson County.

40. Here, Wilson is between the ages of 18 and 21, and desires to purchase and possess handguns, handgun ammunition, and "semiautomatic assault rifles," and would do so but for fear of prosecution under the terms of the Ordinance, because it prohibits such conduct.

41. The Ordinance is currently in effect, and the executive branch of Jackson County has not disclaimed enforcement of the Ordinance. Thus, Plaintiffs have a well-founded fear that the Ordinance may be enforced against them and therefore may bring a pre-enforcement challenge to the Ordinance on constitutional and statutory preemption grounds without needing to have been prosecuted thereunder.

42. Separately, the State has standing to pursue this action because the State has a sovereign interest in ensuring compliance with the Second Amendment.

43. The State also has standing because the Ordinance at issue threatens to harm the integrity of the Revised Statutes of Missouri, and the State has a sovereign interest in protecting the creation and enforcement of its legal code. *See, e.g.*, *Alfred Snapp & Sons, Inc. v. Puerto Rico ex rel. Barez*, 459 U.S. 592, 601 (1982).

44. The State also has standing to pursue this action as *parens patriae* because the Ordinance violates the constitutional rights of a substantial number of Missourians. *See, e.g.*, *New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 281-82 (2d Cir. 2024); *New York ex rel. Vacco v. Mid Hudson Med. Group, P.C.*, 877 F. Supp. 143, 146 (S.D.N.Y. 1995); *cf. Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 324-27 (D.P.R. 1999) (Puerto Rico had *parens patriae* standing to sue for violations of the Equal Protection Clause).

## STATEMENT OF FACTS

### A. Defendants Enacted an Admittedly "Unlawful" Ordinance, "Hoping for a Court Battle."

45. On July 22, 2024, the Jackson County Legislature promulgated Ordinance No. 5865, which proposed various firearms restrictions on adults under the age of 21. Thereafter, the Jackson County Legislature passed the Ordinance on November 4, 2024.

46. The Ordinance reads in relevant part as follows, with the provisions Plaintiffs challenge *italicized*:

> *(1) A person under twenty-one years of age may not purchase a handgun or handgun ammunition, and, except as otherwise provided in this chapter, no person may sell or transfer a handgun or handgun ammunition to a person under twenty-one years of age.*

(2) No person may recklessly sell, lease, loan, give or transfer any firearm to another person less than eighteen years of age without the express permission of that person's custodial parent or legal guardian.

*(3) A person at least eighteen years of age, but less than twenty-one years of age, may not possess a semiautomatic assault rifle except under the following conditions are met [sic]:*

> *(a) In attendance at a firearms safety course; or,*
>
> *(b) Engaging in practice in the use of a firearm or target shooting at an established range authorized by the governing body of the jurisdiction in which such range is located or any other area where the discharge of a firearm is not prohibited; or,*
>
> *(c) On real property under the control of his or her custodial parent, other relative, or legal guardian and who has the permission of the custodial parent or legal guardian to possess a firearm; or,*
>
> *(d) Is a member of law enforcement, the armed forces of the United States, national guard, or organized reserves, when on duty.*

47. After the Ordinance first passed, Frank White, Jr., the Jackson County Executive, vetoed the Ordinance, explaining that it "remains fundamentally flawed, unlawful, and counterproductive."[8]  In his veto, Mr. White explained that "Missouri's preemption statute … prohibits local jurisdictions from enacting firearms regulations beyond those authorized by state law.  Ordinance 5865 disregards [preemption], imposing prohibitions unsupported by state or federal law." *Id.*

48. Additionally, Mr. White attached a legal opinion from Bryan Covinsky, County Counselor. In his legal opinion, Mr. Covinsky explained that "the current Missouri State laws, specifically the exemption contained in RSMo §21.750, would make Ordinance 5865 unenforceable and also expose potential liability on behalf of Jackson County." *Id.* at 8.

49. Notwithstanding the County Executive and Counselor's advisement that the Ordinance clearly and unambiguously violated Missouri law, the Jackson County Legislature overrode the Executive's veto, and the Ordinance went into effect. *Id.* at 4.

---

[8] *Supra* note 3, at 5.

50. The sponsor of the Ordinance, Manny Abarca, touted the Ordinance as a way for the Jackson County Legislature to "challenge[] the preemption laws put on by the state."[9] In fact, Mr. Abarca stated that the County Legislature "wrote this [Ordinance], knowing that it would be challenged, *hoping for a court battle*." *Id.* (emphasis added).

51. Another Jackson County Legislator, Jalen Anderson, seemed to endorse local rebellion against the state, claiming that "it's time county governments and local governments push back. Juveniles [sic, adults ages 18 to 20] should not possess firearms." *Id.*

52. Immediately after Jackson County overrode the veto and the Ordinance took effect, Missouri Attorney General Andrew Bailey issued a "Litigation Hold Notice" to the Jackson County Legislature.[10]

53. Attorney General Bailey's correspondence directed that the Jackson County Legislature "preserve all records" related to "passage of Ordinance 5865, and its subsequent override" of the County Executive's veto. *Id.*

54. On the Attorney General's website, Attorney General Bailey explained that "[t]he right to keep and bear arms is inalienable.... To that end, [he] will be filing suit against Jackson County for their illegal attempt to violate Missourians' Second Amendment rights."[11]

**B. The Second Amendment.**

    **1. Methodology.**

---

[9] Gabe Swartz & Betsy Webster, *County Executive Responds After Legislators Override Veto on Gun Ban for People Under 21*, KCTV5 (Nov. 18, 2024), https://tinyurl.com/ye2re8ty.
[10] *See* https://tinyurl.com/2fuj3mum.
[11] *See* https://tinyurl.com/buwe6w85.

55. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

56. In its landmark 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court rejected the nearly uniform opinions reached by the courts of appeals, which for years had claimed that the Second Amendment protects only a communal right of a state to maintain an organized militia. *Id.* at 581. Setting the record straight, the *Heller* Court explained that the Second Amendment recognizes, enumerates, and guarantees to *individuals* the preexisting right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Id.* at 592.

57. Then, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court explained that the Second Amendment is fully applicable to the states through operation of the Fourteenth Amendment. *Id.* at 791.

58. Next, in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), the Court reaffirmed its conclusion in *Heller* that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and that this "Second Amendment right is fully applicable to the States." *Id.* at 411.

59. And as the Supreme Court explained in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Second and Fourteenth Amendments together guarantee individual Americans not only the right to "keep" firearms in their homes, but also the right to "bear arms," meaning "to carry a handgun for self-defense outside the home," free from infringement by either federal or state governments. *Id.* at 10.

60. Finally, the Supreme Court's latest pronouncement on the Second Amendment reaffirms the textual and historical framework from *Heller* and *Bruen*. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that *Bruen* reiterates "the appropriate analysis"); *see also id.* at 714 (Gorsuch, J., concurring) ("reinforc[ing] the focus on text, history, and tradition, following exactly the path we described in *Bruen*").

61. In addition to clearly recognizing the right of "'law-abiding, responsible citizens' … to public carry," *Bruen* also rejected outright the methodology used within this Circuit and other circuits to judge Second Amendment challenges. *Bruen*, 597 U.S. at 38 n.9.

62. Prior to *Bruen*, courts within the Eighth Circuit had adopted a two-part test for analyzing Second Amendment cases: "First, the court asks 'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.' … Once a defendant rebuts the presumption in favor of the lawfulness of the challenged regulation[,] … the court then evaluates the law 'under some form of means-end scrutiny.'" *United States v. Cunningham*, 2021 U.S. Dist. LEXIS 117994, at *36-37 (N.D. Iowa June 24, 2021); *see also Bruen*, 597 U.S. at 22 n.4 (collecting cases using two-part test). Other circuit courts adopted and used a substantially similar formula, which invariably utilized the very same "judge-empowering 'interest-balancing inquiry'" that *Heller* had rejected. *See Heller*, 554 U.S. at 634; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017) ("the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit"), *aff'd*, 742 F. App'x 218 (9th Cir. 2018).

63. Rejecting this widespread atextual, "judge-empowering" interest-balancing approach as "one step too many," *Bruen* directed (again) the federal courts to first principles: to assess the text of the Second Amendment, informed by the historical tradition. *Bruen*, 597 U.S. at 19, 22.

64. First, the Supreme Court "decline[d] to adopt that two-part approach" used in this and other circuits, and reiterated that, "[i]n keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17.

65. Second, the Supreme Court held that, "[t]o justify [a] regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 692 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.").

66. Third, in reviewing the historical evidence, the *Bruen* Court cabined review of relevant history to a narrow time period, because "not all history is created equal," focusing on the period around the ratification of the Second Amendment, and *perhaps* the Fourteenth Amendment, but only to the extent that it "mere[ly] confirm[s]" a Founding-era tradition. *Bruen*, 597 U.S. at 37. Indeed, the Court noted that "post-ratification" interpretations "cannot overcome or alter th[e] text," and "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 36, 37; *see also id.* at 37-60 (discussing the lack of relevant historical prohibitions on concealed carry in public).

67. In other words, according to the Second Amendment's text, and as elucidated by the Court in *Bruen*, if a member of "the people" wishes to "keep" or "bear" a protected "Arm," then the

ability to do so "shall not be infringed." It does not matter at all how important, significant, compelling, or overriding the government's interest is in infringing the right. Nor does it matter whether a government restriction "minimally" versus "severely" burdens (infringes) the Second Amendment. There are no relevant statistical studies to be consulted. There are no sociological arguments to be considered. The ubiquitous problems of crime or the density of population do not affect the equation. The only appropriate inquiry then, according to *Bruen*, is what the "public understanding of the right to keep and bear arms" was during the ratification of the Second Amendment in 1791. *Bruen*, 597 U.S. at 46-47.

68. Following the Supreme Court's instruction, the Eighth Circuit has explained that "*Bruen* strongly suggests that we should prioritize Founding-era history." *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir.), *reh'g en banc denied*, 2024 U.S. App. LEXIS 21237 (8th Cir. Aug. 21, 2024), *certiorari denied*, 2025 U.S. LEXIS 1555 (Apr. 21, 2025). Indeed, "it is questionable whether the Reconstruction-era sources have much weight," and the Eighth Circuit has described "temporal distance from the founding" as a "serious flaw[]" of previously proffered historical regulations. *Worth*, 108 F.4th at 696, 697.

69. In addition to providing the proper time focus for historical review, the Supreme Court also has instructed as to the scope of the protected persons, conduct, and arms covered by the Second Amendment.

70. **First, the people.** *Heller* explained that, "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. *Heller* cited to *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which held that "'the people' … refers to a class of persons who are part of a national community or who have otherwise developed sufficient

connection with this country to be considered part of that community." *See also Heller*, 554 U.S. at 581 (Second Amendment "is exercised individually and belongs to all Americans.").

71. There is no historical doubt that adults ages 18 to 20 enjoyed Second Amendment rights at the Founding and beyond. In fact, the Supreme Court already has surveyed this Founding-era historical tradition. In *United States v. Miller*, 307 U.S. 174 (1939), the Court collected representative state militia laws from Massachusetts, New York, and Virginia, enacted between 1784 and 1786, which required individuals as young as 16 periodically to train, in public, with firearms "provide[d] himself, at his own Expense." *Id.* at 181; *see also id.* at 180-82; *Heller*, 554 U.S. at 624 ("The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."). Then, on May 8, 1792, just a few months after the Second Amendment was ratified, the Second Militia Act, 1 Stat. 271, provided that "every free able-bodied white male citizen … who is or shall be of age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia."

72. Thus, because the Second Amendment's prefatory militia clause "does not limit" the Amendment's operative "right of the people" clause, "but rather announces a purpose" that serves a "clarifying function," the Second Amendment must protect, *at a minimum*, those persons who belong to the "Militia." *Heller*, 554 U.S. at 577, 578. Otherwise, there would be no "link between the stated purpose and the command" of the operative clause. *Id.* at 577.

73. Accordingly, as a matter of plain text, as confirmed by Founding-era history, the Second Amendment protects, *at a minimum*, 18-to-20-year-old adult Americans, a class of individuals who undoubtedly belonged to the "Militia" when the text was adopted.[12]

74. Even outside of the militia context, adults ages 18 to 20 retained the right to acquire, possess, and carry firearms at the Founding. As the Fifth Circuit recently observed, "[w]hile it may be true that eighteen-to-twenty-year-olds could not then serve on juries, firearm restrictions are notably absent from the government's list of founding-era age-limited civil and political rights." *Reese v. BATFE*, 127 F.4th 583, 591 (5th Cir. 2025). Thus, even though some Founding-era authorities labeled those under the age of 21 "infants," such legal minority status did not reach firearms. Indeed, "young individuals were expected to keep the peace rather than disturb it. In addition to serving in the militia, eighteen-to-twenty-year-olds could be obliged to join the *posse comitatus*, … and bring 'such arms or weapons as they have or can provide.' Before the emergence of standing police forces, the *posse comitatus* was made up of civilians who accompanied sheriffs or other officials in pursuit of fugitives." *Id.* at 598 (citation omitted). Based on this indisputable historical record, the Fifth Circuit invalidated a federal prohibition on the commercial purchase of handguns by adults under the age of 21.

75. Likewise, the Third Circuit recently held that a Pennsylvania restriction on 18-to-20-year-olds' public carry of handguns is not "consistent with the principles that underpin founding-era firearm regulations...." *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 445 (3d Cir. 2025); *see*

---

[12] Of course, although not relevant here, the Second Amendment naturally protects a greater scope of individuals than just the "Militia," by virtue of its use of the more expansive term "the people" in its operative clause. *See Heller*, 554 U.S. at 580-81 (noting "the 'militia' in colonial America consisted of a subset of 'the people,'" and "strong[ly] presum[ing] that the Second Amendment right … belongs to all Americans"). Thus, "the people" includes 80-year-olds, even though they would not have been included in the "Militia."

*also Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 756 (N.D. Tex. 2022) (Texas "cannot sufficiently establish that a *prohibition* on law-abiding 18-to-20-year-olds carrying a handgun in public for self-defense is consistent with this Nation's historical tradition of firearm *regulation*.").

76. This Circuit observed the same traditions. Invalidating a Minnesota ban on public carry by 18-to-20-year-olds, the Eighth Circuit explained that "Minnesota cites common law evidence that (as minors) 18 to 20-year-olds did not have full rights. Minnesota, however, does not put forward common law analogues restricting the right to bear arms." *Worth*, 108 F.4th at 695. Indeed, there were none. Thus, for purposes of this challenge, it is settled that adults under age 21 enjoy the right to public carry within this Circuit – conduct necessarily including the simple possession of firearms. *Id.* at 698.

77. Even the nonbinding Eleventh Circuit, which upheld a restriction on firearm purchases by 18-to-20-year-olds, acknowledged the limitations of its holding. Unable to find a Founding-era *firearm* regulation restricting the Second Amendment rights of these young adults, the Eleventh Circuit pointed generally to Founding-era young adults' assumed "lack[]" of "cash and the capacity to contract"[13] as evidence of an inability to *purchase* firearms. *NRA v. Bondi*, 133 F.4th 1108, 1123 (11th Cir. 2025), *petition for writ of certiorari filed sub nom. NRA v. Glass*, No. 24-1185 (U.S. May 16, 2025). Even so, the court freely acknowledged that "Founding-era laws required minors to carry arms," and it "assume[d] that the Second Amendment protects individuals under the age of 21" with respect to firearm-related conduct *other* than purchases. *Id.* at 1123, 1130.

---

[13] Of course, "[t]he members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar." *NRA v. BATFE*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). Young adults have always "lacked cash" in comparison to their older counterparts, but that is no reason to deny them Second Amendment rights.

78. Of course, to justify a *firearm* restriction, *Bruen* requires a historical tradition of *firearm* regulation (597 U.S. at 17, 24), not a tradition of economic data, contract law principles, and vague assumptions about Founding-era attitudes. The Eleventh Circuit's decision in *Bondi* is unpersuasive because of that court's own admission that the Founders never restricted *firearm* rights of 18-to-20-year-old adults.[14] Indeed, the Eighth Circuit already has rejected that sort of reasoning in *Worth*.

79. The historical evidence therefore establishes a tradition of acquisition, ownership, possession, *and* public carry of commonly owned firearms by adults ages 18 to 20 – all conduct that Defendants now deny Plaintiffs.

80. And to summarize, consistent with the Supreme Court's recognition of this historical tradition, the Eighth Circuit already has held that "[o]rdinary, law-abiding, adult citizens that are 18 to 20-year-olds are members of the people because: (1) they are members of the political community under *Heller*'s 'political community' definition; (2) the people has a fixed definition, though not fixed contents; (3) they are adults; and (4) the Second Amendment does not have a freestanding, extratextual dangerousness catchall." *Worth*, 108 F.4th at 689.

---

[14] The same is true for the Tenth Circuit's decision in *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024). Although observing that "Pineda, who presents himself to be an ordinary, law-abiding citizen under the age of 21 – is part of 'the people' as defined by the Second Amendment," the Tenth Circuit ultimately upheld a Colorado restriction on firearm purchases by those under age 21. *Id.* at 116. But it did so not according to historical tradition, but rather a misplaced reliance on *Heller*'s dicta regarding "conditions and qualifications on the commercial sale of arms." *Id.* at 119. Rather than holding the government to its historical burden as *Bruen* required, the Tenth Circuit cited "academics" for the proposition that *Heller*'s passing discussion of laws *assumed* to have sufficient historical support *when* challenged *actually* created a "safe harbor" from the Second Amendment's very plain text. *Id.* at 119 n.5, 119-20. Thus, the Tenth Circuit engaged in no historical analysis of *firearm regulations* whatsoever, and the interest balancing it employed in its place violated *Bruen* several times over.

81. **Second, the protected conduct.** In its analysis, *Heller* turned to the "substance of the right: 'to keep and bear Arms.'" *Heller*, 554 U.S. at 581. The Court explained that "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id.* at 583. Next, the Court instructed that the "natural meaning" of "bear arms" was "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 584. And "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Id. Bruen,* in fact, was more explicit, explaining that the "definition of 'bear' naturally encompasses public carry." *Bruen*, 597 U.S. at 32.

82. Thus, not only does the Second Amendment protect the ownership and possession of firearms, but also it protects the acquisition of those firearms as a necessary threshold act. Otherwise, there would be no firearms to "keep" or "bear" in the first place. *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."); *see also Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965) ("The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read … and freedom of inquiry, freedom of thought, and freedom to teach.... Without those peripheral rights the specific rights would be less secure."); *Bruen*, 597 U.S. at 70 ("The [Second Amendment] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

83. And because the Second Amendment must protect, *at minimum*, that conduct which effectuates its prefatory militia clause, *see supra*, the Second Amendment necessarily protects the right of 18-to-20-year-olds to purchase firearms that they then can openly carry in public. *See*

*Miller*, 307 U.S. at 181 (collecting Founding-era militia statutes requiring those under 21 to "provide himself, at his own Expense, with a good Musket or Firelock," and then to "appear at his respective muster-field … armed, equipped, and accoutred").

84. **Third, the protected arms.** With respect to the term "Arms," the Court explained that such term includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," and at the Founding, "all firearms constituted 'arms.'" *Heller*, 554 U.S. at 581. Thus, because not only those items and activities in "existence in the 18th century are protected" by the Constitution, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *id.* at 582, and "that general definition covers modern instruments that" so much as "*facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added); *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller* … the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

85. Thus, so long as a weapon is "bearable," the Second Amendment will presumptively protect it, and the constitutionality of a regulation of such weapon's acquisition or possession will be a historical question whose burden the government bears. *Bruen*, 597 U.S. at 28 ("we use history to determine which modern 'arms' are protected by the Second Amendment"); *see also id.* at 17 ("the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation"); *Snope v. Brown*, 2025 U.S. LEXIS 2172, at *4 (June 2, 2025) (Thomas, J., dissenting from denial of certiorari) ("AR-15s are clearly 'Arms' under the Second Amendment's plain text. … Because AR-15s are 'Arms,' the burden shifts to Maryland to

show that banning AR-15s is 'consistent with this Nation's historical tradition of firearm regulation.'").

86. Additionally, the Court has instructed that, in addition to those arms protected according to historical tradition, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" and there is no "dispute that handguns are weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 21, 32 (cleaned up); *see also id.* at 47 (explaining that even historical regulations "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today"). And as for whether weapons other than handguns are in "common use," the Court has found protection based on as few as "approximately 200,000" examples owned nationwide. *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment).

87. But once again, the Second Amendment *at a minimum* must protect those "Arms" necessary for effectuating its prefatory militia clause. Thus, the Second Amendment protects the right of 18-to-20-year-olds to purchase, own, and possess "ordinary military equipment." *Miller*, 307 U.S. at 178.

88. At bottom, the "right to keep and bear arms" – language that facially imposes no age restriction – presumptively applies to "all Americans," presumptively covers the acquisition of firearms, and presumptively extends to all "bearable arms." Anything limiting that expansive reach must comport with a broad and enduring historical tradition – demonstrating that certain persons, activities, or arms were never considered within the scope of the Second Amendment in the first place.

89. Defendants cannot bear their heavy burden. But even if they did, the firearms the Ordinance prohibits are "in common use" today, and so Defendants' prohibition simply "is invalid"

24

as a categorical matter. *Heller*, 554 U.S. at 629; *Bruen*, 597 U.S. at 47 (historical laws are "no justification" when "weapons … are unquestionably in common use today").

**2. Section 1 of the Ordinance Violates the Second Amendment.**

90. The Ordinance operates to prohibit any person "under twenty-one years of age" from "purchas[ing] a handgun or handgun ammunition." Jackson County Code § 5577(1).

91. Yet Plaintiffs undoubtedly are members of "the people" protected by the Second Amendment, being adults ages 18 to 20 years old. *See Worth*, 108 F.4th at 689.

92. Nor is there any "dispute that handguns are weapons 'in common use' today for self-defense" and are protected by the Second Amendment. *Bruen*, 597 U.S. at 32; *Heller*, 554 U.S. at 628.

93. The ammunition used in firearms is also protected. *See Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014)) ("without bullets, the right to bear arms would be meaningless."); *see also Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair."); *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) (per curiam) ("A State cannot circumvent [Second Amendment doctrine] by banning outright the sale or transfer of common-use weapons and necessary ammunition."); *see also* Mo. Const. Art. I, s. 23 (securing "the right of every citizen to keep and bear arms, *ammunition*, and accessories typical to the normal function of such arms") (emphasis added).

94. And the Second Amendment necessarily protects the right to acquire and purchase arms. Indeed, "the right to 'keep and bear arms' surely implies the right to purchase them." *Reese*, 127 F.4th at 590; *see also Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much'

without the ability to acquire arms."); *Luis*, 578 U.S. at 26 (Thomas, J., concurring in the judgment) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise."); *see also Yukutake v. Lopez*, 130 F.4th 1077, 1092 (9th Cir. 2025) ("The right to acquire a firearm is thus not separate from, and outside of, the right to possess it...."); *Sedita v. United States*, 2025 U.S. Dist. LEXIS 19753, at *25 (D.D.C. Feb. 4, 2025) ("a careful reading of the Second Amendment supports a finding that the right to acquire arms is protected"); *Michelle Nguyen v. Bonta*, No. 24-2036, 2025 U.S. App. LEXIS 15220, at *11 (9th Cir. June 20, 2025) ("the Second Amendment's plain text protects the ability to possess multiple arms… [and] it also protects the ability to acquire multiple arms.").

95. Accordingly, Plaintiffs' "proposed course of conduct" – the acquisition of handguns and handgun ammunition for self-defense – is "presumptively guarantee[d]" by the Second Amendment, and Defendants "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 32, 33, 17.

96. Defendants cannot meet their heavy burden because, as established by *Heller*, there is no historical tradition of prohibiting handgun ownership, *see* 554 U.S. at 629, and so Section 1 of the Ordinance is unconstitutional.

### 3. Section 3 of the Ordinance Violates the Second Amendment.

97. Section 3 of the Ordinance operates to generally prohibit adults ages 18 to 20 from possessing a "semiautomatic assault rifle," including for recreational sporting or self-defense purposes.

98. Because the Ordinance fails to provide a definition for "assault rifle," one can only look to other jurisdictions for an idea as to just what it is that Defendants seek to criminalize. For example, various anti-gun states have sought to distinguish "assault weapons" and "assault rifles" from other

semiautomatic rifles by the presence of such features as: pistol grips, threaded barrels, detachable magazines, and telescoping or folding stocks. *See* Mass. Ann. Laws ch. 140, §§ 121, 131M; Cal. Penal Code § 30605; N.J. Stat. § 2C:39-1(w).

99. But despite being slapped with a pejorative label, so-called "assault rifles" are clearly "arms" under the Second Amendment, and are mechanically identical to any other semiautomatic firearm without arbitrarily banned features.

100.     First, "semiautomatic assault rifles" are "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581.

101.     Second, "semiautomatic assault rifles" are certainly firearms and, at the Founding, "all firearms constituted 'arms.'" *Heller*, 554 U.S. at 582.

102.     Third, "semiautomatic assault rifles" are "instruments that constitute bearable arms," to which "the Second Amendment extends, prima facie...." *Heller*, 554 U.S. at 582.

103.     And fourth, "semiautomatic assault rifles" are "modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28; *see also Rahimi*, 602 U.S. at 691-92 ("As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. … Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.").

104.     Thus, "semiautomatic assault rifles" are "Arms" under the Second Amendment's plain text, and their acquisition and possession is "presumptively protect[ed]...." *Bruen*, 597 U.S. at 17; *see also Heller*, 554 U.S. at 582 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms"); *Snope*, 2025 U.S. LEXIS 2172, at *4 (Thomas, J., dissenting from denial of certiorari) ("AR-15s are clearly 'Arms' under the Second Amendment's

27

plain text. … Because AR-15s are 'Arms,' the burden shifts to Maryland to show that banning AR-15s is 'consistent with this Nation's historical tradition of firearm regulation.'").

105.     Not only that, but "semiautomatic assault rifles" in fact are *conclusively* protected, irrespective of any historical tradition to the contrary, because they are "in common use" today. *See Bruen*, 597 U.S. at 47.

106.     Indeed, "assault weapons" and "assault rifles" are "overwhelmingly chosen by American society" for "self-defense," and thus the possession of that class of arms cannot be prohibited. *Heller*, 554 U.S. at 628. Full stop.

107.     Outnumbering the ubiquitous Ford F-150 several times over, there are tens of millions of AR-15-style rifles – the ubiquitous firearms most often demonized as "assault rifles" – in the hands of law-abiding American citizens nationwide.[15] *See Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal. 2021) ("In 2018, 909,330 Ford F-150s were sold. Twice as many modern rifles were sold the same year."). In California alone, that same district court observed that, "of the 19.9 million firearms in the state, assault weapons ma[d]e up 5% or approximately 1,000,000" in 2021. *Id.* at 1021-22. That small sampling is far in excess of the "approximately 200,000" stun guns owned nationwide that the Supreme Court found protected in *Caetano*. 577 U.S. at 420 (Alito, J., concurring in the judgment) ("stun guns are widely owned and accepted"). And it even further exceeds the 64,980 nunchaku another district court found sufficient to constitute "common use" in *Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. 2018).

---

[15] Paul Bedard, *Georgetown Professor: AR-15 'Commonly Owned' and 'Incredibly Popular,'* Wash. Examiner, https://tinyurl.com/4pskt7tk (last visited Mar. 14, 2025); Jake Fogleman, *Poll: One in Twenty Americans Own an AR-15*, The Reload (Mar. 29, 2023), https://tinyurl.com/ycy29bpa.

108.     Accordingly, various judges and Justices have observed that AR-15-style rifles, perhaps the quintessential firearms demonized as "assault rifles," are unquestionably in common use.  In fact, writing for a *unanimous* Court, Justice Kagan recently explained that "'military style' assault weapons, … includ[ing] AR-15 rifles, AK-47 rifles, and .50 caliber sniper rifles[,] … are both widely legal and bought by many ordinary consumers.  []The AR-15 is the most popular rifle in the country."  *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 2025 U.S. LEXIS 2199, at *20 (June 5, 2025); *see also Snope*, 2025 U.S. LEXIS 2172, at *3 (Thomas, J., dissenting from denial of certiorari) (AR-15s are "the most popular civilian rifle in America."); *Garland v. Cargill*, 602 U.S. 406, 430 (Sotomayor, J., dissenting) (AR-15s are "commonly available, semiautomatic rifles"); *Bondi v. VanDerStok*, 145 S. Ct. 857, 881 (2025) (Thomas, J., dissenting) (referencing the AR-15 as "the most popular rifle in America" (quoting *VanDerStok v. Garland*, 86 F.4th 179, 208 (5th Cir. 2023) (Oldham, J., concurring))).

109.     Even left-leaning news outlets have dubbed the AR-15 "the bestselling rifle in the U.S.,"[16] "America's national gun,"[17] and "America's rifle."[18]

110.     That ubiquity alone is enough to garner Second Amendment protection, and Section 3 of the Ordinance is simply "invalid."  *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 26 ("the traditions of the American people … demand[] our unqualified deference").

111.     Separately, because "semiautomatic assault rifles" are *at a minimum* presumptively protected and therefore deserving of *Bruen*'s stringent historical framework, any government

---

[16] Terry Gross, *How the AR-15 Became the Bestselling Rifle in the U.S.*, NPR (Apr. 20, 2023), https://tinyurl.com/5n6ydebp.
[17] Chelsea Bailey, *How the AR-15 Became 'America's National Gun' and Loved by the NRA*, BBC (Apr. 14, 2023), https://tinyurl.com/2fpsm849.
[18] Jon Schuppe, *America's Rifle: Why So Many People Love the AR-15*, NBC News, https://tinyurl.com/5h4c2run (Feb. 15, 2018).

restriction limiting the Second Amendment's expansive reach must comport with a broad and enduring historical tradition – demonstrating that certain persons, arms, or activities were never considered within the scope of the Second Amendment in the first place.

112.    Defendants bear the burden of proving consistency with early American historical tradition.   They cannot do so, because there is no Founding-era tradition of a feature-based restriction on firearm ownership.   To the contrary, the Founders intended citizens to possess all manner of "bearable" arms, up to and including "military-style" weapons and "ordinary military equipment." *Miller*, 307 U.S. at 178.  As Tench Coxe explained in 1788, "Congress have no power to disarm the militia.  Their swords, and every other terrible implement of the soldier, are the birth-right of an American."[19]   Henry Campbell Black echoed this understanding in a treatise over a century later: "The citizen has at all times the right to keep arms of modern warfare."[20]   If Defendants wish to liken "semiautomatic assault rifles" to "military-style" weapons, they will be unable to explain how the Founders would have accepted such a ban on either.

113.    Rather, the Founders understood that the citizen militia had to be as well-equipped as the standard infantryman.[21]   To that end, they set about to ensure that the ordinary citizen could access and maintain quintessentially "military" equipment.   Thus, the Founding-era militia mustered with then-modern "ordinary military equipment," which was "in common use" among private citizens at the time.  *Miller*, 307 U.S. at 178, 179.  And later, during the War of 1812, Congress took actions to ensure that military-spec firearms would be readily available for civilian

---

[19] Tench Coxe, *A Pennsylvanian, No. 3*, <u>Pa. Gazette</u>, Feb. 20, 1788, at 2 (emphases removed).

[20] Henry Campbell Black, <u>Handbook of American Constitutional Law</u> § 203 (2d ed. 1897).

[21] *See* Noah Webster, <u>An Examination into the Leading Principles of the Federal Constitution Proposed by the Late Convention Held at Philadelphia</u> 43 (Prichard & Hall 1787) (emphasis added); <u>The Federalist No. 29</u> at 181 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis added).

purchase.  *See* James N. Gibson, <u>A War Without Rifles: The 1792 Militia Act and the War of 1812</u> at 78-85 (2016).

114.    The Founders were not silent as to why they believed such armament parity was necessary.  Indeed, the Supreme Court already discussed the Founders' motivations in *Heller*. Noting that a "'citizens' militia' [i]s a safeguard against tyranny" and "necessary to oppose an oppressive military force if the constitutional order broke down," the Court recognized the Founders' central concern that "the Federal Government would disarm the people in order to impose rule through a standing army or select militia." *Heller*, 554 U.S. at 600, 599, 598.

115.    Thus, 1789, Tench Coxe explained that, "[a]s civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, and as the military forces which must be occasionally raised to defend our country, might pervert their power to the injury of their fellow-citizens, the people are confirmed … in their right to keep and bear their private arms."  Tench Coxe, Remarks on the First Part of the Amendments to the Federal Constitution, <u>Phila. Fed. Gazette</u>, June 18, 1789, at 2.  Likewise, Noah Webster believed that "the people" would in fact be the "superior" military force: "The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretence, raised in the United States."  Webster, *supra*, at 32.  It would make little sense for the manifestly tyranny-deterrent Second Amendment to protect only those firearms *inferior to* government-owned firearms.

116.    In the decades that followed the Founding, citizen access to military-used arms persisted.  By the mid-19th century, courts consistently held that "arms … are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment."  *Aymette v. State*, 21 Tenn. 154, 158 (1840) (emphasis removed).  Other courts took an even broader view,

protecting "arms of every description, and not such merely as are used by the militia." *Nunn v. State*, 1 Ga. 243, 251 (1846) (emphasis removed). But to Plaintiffs' knowledge, no contemporaneous court ever posed a more *restrictive* view that excluded military arms.

117.     Thus, in one recent case, an Oregon court observed that even well into the 19th century, "there was no clear distinction between private and military use at the time of [Oregon] statehood [in 1859]." *Arnold v. Kotek*, 2023 Ore. Cir. LEXIS 3887, at *9 (Harney Cnty. Nov. 24, 2023). Indeed, while "most private gun manufacturers were angling for military contracts" at the time, they "would sell any firearm to private citizens who could afford one." *Id.* at *10. Private citizens then used these arms "for self-defense," "defense of the state," and in "militia activities." *Id.*

118.     With no relevant historical tradition to support its gun ban, Section 3 of the Ordinance is unconstitutional.

**C.  The Fourteenth Amendment.**

**1.   The Ordinance Is Unconstitutionally Vague.**

119.     The Fourteenth Amendment to the United States Constitution provides: "No State shall … deprive any person of life, liberty, or property, without due process of law...."

120.     The Supreme Court has made clear that "doctrine of vagueness … incorporates notions of fair notice or warning" and "requires legislatures to set reasonably clear guidelines … to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974). Indeed, a law violates the Fourteenth Amendment's guarantee of due process "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966); *see also*

*Johnson v. United States*, 576 U.S. 591, 595 (2015) (a government "violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement").

121.     Although Section 3 of the Ordinance prohibits adults ages 18 to 20 from possessing "semiautomatic assault rifles," it fails to define this term in any way whatsoever.

122.     Although the term "semiautomatic" has a commonly accepted meaning of "a weapon that fires one round of bullets each time the trigger is pressed,"[22] the "assault rifle" pejorative has no such consensus.  Nor is "assault rifle" defined in Missouri state law, and there is no uniformity among the various jurisdictions that employ widely varying statutory definitions for "assault" weapons.  *See* Md. Code Ann., Crim. Law § 4-303 and Md. Code Ann., Pub. Safety § 5-101; Mass. Ann. Laws ch. 140, §§ 121, 131M; N.J. Stat. § 2C:39-1(w); Cal. Penal Code § 30605.

123.     Because the Ordinance fails to provide a definition for "assault rifle" a term which has no broadly accepted specific meaning, an individual subject to the Ordinance has no way of knowing whether any semiautomatic rifle they may possess is an "assault rifle" in violation of the Ordinance.

124.     Because of the aforementioned uncertainty on the meaning of "assault rifle," the Ordinance's assault weapon ban for adults ages 18 to 20 fails to put the public on notice as to exactly "what the State commands or forbids."  *Bouie*, 378 U.S. at 351.

---

[22] *Semiautomatic*, <u>Cambridge Dictionary</u>, https://tinyurl.com/24zz8h4m (last visited Mar. 17, 2025).

125.    The Ordinance's failure to define "assault rifle" also invites inconsistent and arbitrary enforcement, as law enforcement, just like the public, is left to guess as to what exactly constitutes an "assault rifle."

126.    Separately, Section 1 of the Ordinance fails to define "handgun ammunition," an inherently vague term due to the fact that many (if not most) ammunition calibers are used in both handguns and rifles.

127.    Therefore, the Ordinance fails to give notice as to what it prohibits, placing any adult aged 18 to 20 who possesses a semiautomatic rifle in legal jeopardy with no clear way to follow the law.  And by failing to define "handgun ammunition," the Ordinance leaves 18-20 year old adults (and firearm dealers) guessing what kind of ammunition may be purchased by and sold to those persons.

128.    Sections 1 and 3 of the Ordinance are unconstitutionally vague and violate the due process rights of those who would be subject to its mandates.

**D.  The Ordinance Violates Missouri's State Preemption Law.**

129.    The Ordinance violates Missouri law, as it falls squarely within the broad prohibitions contained in Missouri's firearm preemption law, which precludes any "ordinance … by any political subdivision of this state" from "touching in any way **firearms**, components, **ammunition** and supplies...."  Mo. Rev. Stat. § 21.750(1) (emphases added).

130.    State law clearly and expressly prohibits any "county, city, town, village, municipality, or other political subdivision of this state" from "adopt[ing] any order, ordinance or regulation concerning in any way the sale, purchase, purchase delay, transfer, ownership, use, keeping, possession, bearing, transportation, licensing, permit, registration, taxation other than

34

sales and compensating use taxes or other controls on firearms, components, ammunition, and supplies...." Mo. Rev. Stat. § 21.750(2).

131.    The only exceptions to Missouri's sweeping preemption law are local laws which mirror "exactly" the state's own laws and certain local regulations of the open carry and discharge of firearms. Mo. Rev. Stat. § 21.750(3)(1). Those limited exceptions are not at issue here.

132.    Section 1 of the Ordinance purports to prohibit the "**purchase**," "**s[ale]**," and "**transfer**" of a "**handgun**" and "**handgun ammunition**" to "a person under twenty-one years of age," despite Mo. Rev. Stat. § 21.750(2)'s clear prohibition on any "ordinance … concerning in any way the **sale**, **purchase**, … [or] **transfer**" of "**firearms** [and] **ammunition**...."

133.    Section 3 of the Ordinance purports to prohibit "a person at least eighteen years of age, but less than twenty-one years of age" from "**possess[ing]** a semiautomatic assault **rifle**" other than in certain limited circumstances, despite Mo. Rev. Stat. § 21.750(2)'s clear prohibition on any "ordinance … concerning in any way the … **possession**" of a "**firearm**[]...."

134.    Missouri's preemption law allows a political subdivision to pass only those ordinances "which conform[] exactly with any of the provisions of sections 571.010 to 571.070, with appropriate penalty provisions, or which regulate[] the open carrying of firearms readily capable of lethal use or the discharge of firearms within a jurisdiction, provided such ordinance complies with the provisions of section 252.243."[23] Mo. Rev. Stat. § 21.750(3)(1).

135.    Sections 1 and 3 of the Ordinance do not meet any of those exceptions.

136.    With respect to Section 1, neither federal nor Missouri law prohibits adults under the age of 21 from purchasing handguns or handgun ammunition as a general matter. Likewise, neither federal nor Missouri law prohibits unlicensed individuals from selling or transferring

---

[23] Mo. Rev. Stat. §§ 571.010 to 571.070 are the statutes related to weapons.

handguns or handgun ammunition to adults under the age of 21. Indeed, both federal and Missouri law leave undisturbed the *private* sale of handguns and handgun ammunition to those under 21. 18 U.S.C. § 922(b)(1); Mo. Rev. Stat. §§ 571.060, 571.070.[24] Both federal and Missouri law only prohibit those under 21 from purchasing handguns and handgun ammunition *from FFLs*. *See* 18 U.S.C. § 922(b)(1); Mo. Rev. Stat. § 571.080. Accordingly, Section 1's prohibition of *all* under-21 handgun sales is preempted by Missouri law.

137.    With respect to Section 3, neither federal nor Missouri law prohibits adults under the age of 21 from possessing "semiautomatic assault rifles." Indeed, neither source of law so much as defines this term – much less regulates "assault" firearms as such. *See* 18 U.S.C. § 922; Mo. Rev. Stat. § 571.010 *et seq.* Accordingly, Section 3's general prohibition on possession of so-called "semiautomatic assault rifles" by adults under 21 is preempted under Missouri law.

138.    Even so, Section 3 suffers from additional defects. First, the Ordinance utterly fails to define "assault rifle," its operative term. Thus, both Plaintiffs *and* Defendants are left guessing as to which firearms actually are prohibited.

139.    Second, conspicuously absent from the Ordinance is any exemption for *transport* or *traveling* with an "assault rifle" to any of the enumerated locations where an adult under the age of 21 would be allowed to engage in practice or target shooting. In other words, the Ordinance affects *all* adults under 21 who so much as happen to be traveling *through* Jackson County.

140.    And third, because Section 1 leaves undisturbed the *possession* of handguns, taken together, Sections 1 and 3 lead to the absurd result where an adult under the age of 21 may possess

---

[24] *See* https://tinyurl.com/3t3p3kd7 ("Under federal law, unlicensed persons may not sell, deliver or otherwise transfer a handgun or handgun ammunition to any person the transferor knows or has reasonable cause to believe is under the age of 18....").

a 10mm Glock handgun but not a .22 LR AR-15-style rifle. Thus, the Ordinance illogically permits the possession of *more* lethal and *more* concealable firearms than those it purports to ban.

141.     At bottom, Sections 1 and 3 of the Ordinance violate the Second and Fourteenth Amendments to the United States Constitution and are additionally clearly and unambiguously preempted by Missouri law, and therefore are invalid and void.

**COUNT ONE**
**Violation of the Second and Fourteenth Amendments**
**U.S. Const. amend. II, 42 U.S.C. § 1983**

142.     All foregoing allegations are repeated and realleged as if fully set forth herein.

143.     The challenged sections of the Ordinance infringe Plaintiffs' Second Amendment rights, applicable to the state of Missouri through operation of the Fourteenth Amendment, *McDonald*, 561 U.S. at 791, that "shall not be infringed," including the right to acquire and possess a handgun, handgun ammunition, and "semiautomatic assault rifles."

144.     Plaintiffs are or represent members of "the people" who desire to exercise their right to keep and bear arms by purchasing handguns and handgun ammunition from private parties, and semiautomatic "assault rifles" from private parties and licensed dealers. Plaintiffs also desire to exercise their right to keep and bear arms by possessing "semiautomatic assault rifles" for self-defense and for all lawful purposes. However, the challenged provisions infringe that right, prohibiting Plaintiffs (including members and supporters of GOA and GOF) from acquiring these firearms, even to keep in their homes for self-defense.

145.     Under *Heller*, *Caetano*, and *Bruen*, prohibitions on arms that are "in common use" are "invalid," irrespective of historical tradition of regulation. *Heller*, 554 U.S. at 629; *Caetano*, 577 U.S. at 411-12 (per curiam); *Bruen*, 597 U.S. at 47.

146.     Handguns are "unquestionably in common use today." *Bruen*, 597 U.S. at 47.

147.     Semiautomatic "assault rifles" and "assault weapons" likewise are in common use.

148.     Thus, because Sections 1 and 3 of the Ordinance prohibit firearms "in common use," these provisions are "invalid." *Heller*, 554 U.S. at 629.

149.     Separately, under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 20-21. Thus, the burden is on the government to justify the challenged provisions based on the historical tradition of the activity that it is now attempting to regulate.

150.     Because Defendants will not be able to shoulder that burden, the Ordinance must be struck down as violative of the Second Amendment.

## COUNT TWO
### Violation of the Fourteenth Amendment
### U.S. Const. amend. XIV, 42 U.S.C. § 1983

151.     All foregoing allegations are repeated and realleged as if fully set forth herein.

152.     The Fourteenth Amendment to the United States Constitution provides: "No State shall … deprive any person of life, liberty, or property, without due process of law...."

153.     As part of that guarantee, the Supreme Court has made clear that penal statutes "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties...." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Indeed, "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Bouie v. Columbia*, 378 U.S. 347, 351 (1964).

154.     Although Section 3 of the Ordinance prohibits adults ages 18 to 20 from possessing "semiautomatic assault rifles," it supplies no definition for the term, or any sort of explanation for what this term means.

155.     Although the term "semiautomatic" has a typical meaning of "a weapon that fires one round of bullets each time the trigger is pressed," the term "assault rifle" has no such common meaning, nor is it defined in Missouri state law.  Nor is there any etymological uniformity among the various jurisdictions that do define "assault" weapons.  *See e.g.*, Md. Code Ann., Crim. Law § 4-303 and Md. Code Ann., Pub. Safety § 5-101; Mass. Ann. Laws ch. 140, §§ 121, 131M; N.J. Stat. § 2C:39-1, § 2C:39-5; Cal. Penal Code § 30605.

156.     Because the Ordinance does not define "assault rifle," a term without a broadly accepted specific meaning, an individual subject to the Ordinance has no way of knowing whether any semiautomatic rifle they may possess is an "assault rifle," placing gun owners in possible unknowing violation of the Ordinance.

157.     Thus, the Ordinance's assault weapon ban for adults ages 18 to 20 fails to put the public on notice as to exactly "what the State commands or forbids."  *Bouie*, 378 U.S. at 351.

158.     The Ordinance's failure to define "assault rifle" also invites inconsistent and arbitrary enforcement, as law enforcement is left to guess as to what exactly constitutes an "assault rifle," and thus the Ordinance's enforcement will be based on the subjective whims and opinions of individual officers regarding which firearms constitute "assault rifles."

159.     Therefore, Section 3 of the Ordinance fails to give adequate notice as to what conduct it prohibits, placing any adult aged 18 to 20 who possesses a semiautomatic rifle in legal jeopardy with no clear way to follow the law.

160. Therefore, Section 3 of the Ordinance is unconstitutionally vague and violates the due process rights of those who would be subject to its mandates.

161. Section 1 of the Ordinance is unconstitutionally vague for similar reasons. Failing to define "handgun ammunition," it leaves Plaintiffs and those who would sell ammunition to them entirely without guidance as to what calibers or sorts of cartridges are permissible to sell to those 18-20, versus what is prohibited. Since many (if not most) calibers can be used in at least some handguns, an expansive reading of the Ordinance might mean that 18-20 year olds cannot purchase *most* types of ammunition, even if intended for use in a long gun. This not only creates uncertainty for buyers and sellers, but also invites arbitrary enforcement.

## COUNT THREE
### Enactment of Preempted Firearm Regulations in
### Violation of Mo. Rev. Stat. § 21.750

162. All foregoing allegations are repeated and realleged as if fully set forth herein.

163. The plain text of Ordinance Sections 1 and 3 attempts to directly control that which the General Assembly has expressly reserved unto itself.

164. Missouri's firearm preemption law, Mo. Rev. Stat. § 21.750(2), prohibits any "county, city, town, village, municipality, or other political subdivision of this state" from "adopt[ing] any order, ordinance or regulation concerning in any way" the "purchase," "sale," "transfer," or "possession" of "firearms" or "ammunition."

165. In blatant, knowing, and willful contravention of this preemption law, Section 1 of the Ordinance prohibits adults under the age of 21 from "purchas[ing]" any "handgun" or "handgun ammunition." Likewise, Section 1 prohibits individuals from "sell[ing]" or "transfer[ring]" any "handgun" or "handgun ammunition" to adults under 21. The Ordinance's

language thus falls squarely within the preemption law's plain text, violating state law and therefore being preempted.

166.     Next, Section 3 of the Ordinance generally prohibits adults under the age of 21 from "possess[ing] a semiautomatic assault rifle." Once again, this language falls squarely within the preemption law's plain text, and Section 3 of the Ordinance is preempted.

167.     Finally, and alternatively, Mo. Rev. Stat. § 21.750(1) provides that the "general assembly hereby occupies and preempts the **entire field** of legislation **touching in any way** firearms, components, ammunition and supplies to the complete exclusion of any order, ordinance or regulation by any political subdivision of this state." Emphasis added.

168.     In Missouri, "[p]reemption of a local law by a statute may be express or implied. Express preemption occurs when the General Assembly has explicitly proscribed local regulation in a specific area." *Coop. Home Care, Inc. v. City of St. Louis*, 514 S.W.3d 571, 579 (Mo. 2017).

169.     Here, the General Assembly has expressly preempted Jackson County's Ordinance because the General Assembly "occupies and preempts the entire field of legislation touching in any way" firearms and ammunition. *See* Mo. Rev. Stat. § 21.750(1). The Ordinance therefore violates Missouri's field preemption.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully request that relief be granted and judgment be entered in their favor and against Defendants as follows:

1.  An order declaring that the challenged Ordinance Sections 1 and 3 violate the Second and Fourteenth Amendments;

2.  An order declaring that the challenged Ordinance Sections 1 and 3 violate and are preempted by Mo. Rev. Stat. § 21.750;

41

3. An order permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Sections 1 and 3 of the Ordinance;

4. Nominal damages;

5. Attorneys' fees and costs pursuant to any statute or authority, including 42 U.S.C. § 1988; and

6. Such other further relief as is necessary to effectuate this Court's judgment or that this Court otherwise deems just and appropriate.


Dated: June 26, 2025                                    Respectfully submitted,


**ANDREW BAILEY**
ATTORNEY GENERAL

JOSHUA M. DIVINE                                        */s/ David E. Roland*
SOLICITOR GENERAL                                       David E. Roland
                                                        Mo. Bar No. 60548
*/s/ Victoria S. Lowell*                                Roland Law Firm
Peter F. Donohue, Sr., #75835(MO)                       14779 Audrain Road 815
  *Deputy Director of Special Litigation*               Mexico, MO 65265
Victoria Lowell, #76461(MO)                             Phone (314) 604-6621
  *Assistant Attorney General*                          libertyandjustice@gmail.com
                                                        *Counsel for Plaintiffs Wilson, GOA, and GOF*
OFFICE OF THE ATTORNEY GENERAL
207 W. High Street                                      Stephen D. Stamboulieh*
Jefferson City, MO 65101                                MS Bar No. 102784
Tel:  (314) 340-4792                                    Stamboulieh Law, PLLC
Fax: (573) 751-0774                                     P.O. Box 428
Peter.Donohue@ago.mo.gov                                Olive Branch, MS 38654
Victoria.Lowell@ago.mo.gov                              Phone (601) 852-3440
                                                        stephen@sdslaw.us
*Counsel for the State of Missouri*                     *Pro Hac Vice forthcoming*
                                                        *Counsel for Plaintiffs Wilson, GOA, and GOF*